COLORADO COURT OF APPEALS                                    2016COA95

Court of Appeals No. 15CA0467
City and County of Denver District Court No. 12CV3907
Honorable Kenneth M. Laff, Judge

Judith Z. Miller and Thomas C. Miller,

Plaintiffs-Appellants,

v.

Bank of New York Mellon, as Trustee for the Certificate Holders of CWABS,
Asset-Backed Certificates 2004-10, f/k/a Bank of New York; Bank of America,
N.A.; and Countrywide Home Loans, Inc.,

Defendants-Appellees.

_____

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE TAUBMAN
Dailey and Freyre, JJ., concur

Announced June 16, 2016

_____

Edward Dale Parrish, PC, Edward Dale Parrish, James Wade Noland, Golden,
Colorado, for Plaintiffs-Appellants

Holland & Hart LLP, Christina F. Gomez, Sean M. Hanlon, Denver, Colorado,
for Defendant-Appellee Bank of New York Mellon

Akerman LLP, Justin D. Balser, Melissa L. Cizmorris, Denver, Colorado, for
Defendants-Appellees Bank of America and Countrywide Home Loans

¶ 1     In this case involving dual tracking, a process where banks pursue foreclosure on a home while negotiating a loan modification, plaintiffs, Judith Z. and Thomas C. Miller (the Millers), filed claims against five financial institutions (collectively the Banks).[1]  The Millers contend that the Banks improperly subjected them to dual tracking in violation of the consent judgment that resulted from the National Mortgage Settlement generally prohibiting dual tracking, as discussed below.  The district court dismissed their complaint for failure to state a claim for relief, and the Millers appeal from that judgment.  We affirm.

## I.     Background

¶ 2     We consider only facts alleged in the Millers' amended complaint, the documents they attached as exhibits or incorporated by reference, and matters proper for judicial notice.  *Fry v. Lee,*

---

[1] The defendants are Bank of New York Mellon (BNY Mellon), Bank of America, N.A. (BANA), Countrywide Home Loans, Inc. (CHL), Mortgage Electronic Registrations Systems (MERS), and Wilshire Credit Corporation, Inc. (Wilshire).  Apparently, although all the parties list Wilshire as a party on appeal, the district court dismissed Wilshire because BANA bought Wilshire or Wilshire merged with it.  Thus, Wilshire is not a party on appeal.

2013 COA 100, ¶ 19, ___ P.3d ___, ___. We view all facts in the light most favorable to the Millers. *Id.* at ¶ 17, ___ P.3d at ___.

¶ 3     In September 2004, the Millers signed a note and deed of trust to obtain a $422,750 loan to purchase a house in Denver. The loan was a three-year adjustable rate mortgage with an initial annual interest rate of 8.075%. CHL originally gave them the loan, under the trade name of America's Wholesale Lender. A deed of trust, given to MERS as beneficiary, secured the loan.

¶ 4     The Millers began missing payments in 2007, and CHL began foreclosure proceedings on the house. In 2008, CHL transferred the loan to BNY Mellon, and BANA serviced the loan on BNY Mellon's behalf. MERS also assigned its interest in the deed of trust to BNY Mellon.[2]

¶ 5     The Millers separately filed for bankruptcy, and they both received discharges in 2009. Following the conclusion of both bankruptcy cases, BANA told the Millers to vacate the house. The

---

[2] As a result, the Banks and the Millers agree that MERS is not a proper party to this appeal, and, accordingly, it has been dismissed from the appeal.

Millers instead stayed in the house and eventually entered into negotiations with BANA regarding a loan modification.

¶ 6     In February 2012, BNY Mellon moved for an order authorizing the public trustee to proceed with a foreclosure sale in the Denver County District Court against the Millers under C.R.C.P. 120.

¶ 7     In June 2012, while the Rule 120 action was pending, the Millers filed their own complaint against the Banks in the Denver County District Court to quiet title to the house in their favor.  The Millers alleged that BNY Mellon had not established an unbroken chain of title and that the Millers had not been afforded due process in the Rule 120 action because the court had not conducted a hearing.

¶ 8     In July 2012, the court in the Rule 120 action held a hearing and authorized the sale of the house.  Meanwhile, the Millers continued negotiating a loan modification with BANA.

¶ 9     On December 31, 2012, BANA sent two contradictory letters to the Millers.  One letter stated that their request for a loan modification had been denied, and the other stated that their request had been approved.

¶ 10     In 2013, BANA and the Millers agreed to a loan modification, although the Millers averred in their amended complaint that they accepted the modified loan under duress because of the threat of foreclosure.[3]  They began making payments three months before they executed the loan modification agreement in May 2013.  They agreed to add all their unpaid and deferred interest, fees, charges, escrow advances, and other costs, excluding unpaid late charges, to the outstanding principal balance, for a combined balance of $630,077.16.  BANA permanently forgave $220,077.16 of that balance, leaving a new principal balance of $410,000.  BANA also deferred $72,321.19 of the new balance until the end of the life of the loan, with no accrued interest.  BANA applied an initial 2% annual interest rate to the remainder, which would eventually increase to 3.375%.

¶ 11     BNY Mellon dismissed the Rule 120 action in September 2013, seven months after the Millers began making modified payments and four months after the execution of the modification agreement.

---

[3] Despite this, the Millers do not seek to void the modified note and deed of trust.

4

¶ 12    In October 2014, the Millers amended their complaint, asserting claims for breach of the implied duty of good faith and fair dealing, intentional infliction of emotional distress, fraud, and negligence.  The Banks moved to dismiss the Millers' amended complaint.

¶ 13    The court granted the motion.  It ruled that the Millers' tort claims were barred by the economic loss rule because the Millers had not identified any duty independent of the parties' contractual obligations.  The court also dismissed the Millers' contract claim for breach of the implied duty of good faith and fair dealing because it concluded that the Millers did not have a reasonable expectation that their original loan would be modified or that the Banks would not engage in dual tracking.

¶ 14    The Millers raise two contentions on appeal: (1) the district court erred in determining that the economic loss rule barred their tort claims and (2) the court erred in dismissing their contract claim because they had a reasonable expectation that the Banks would not engage in dual tracking and would modify their loan.  We disagree.

## II.     Motion to Dismiss Standard of Review

¶ 15     We review de novo a district court's grant of a motion to dismiss.  *Fry*, ¶ 17, ___ P.3d at ___.

¶ 16     A motion to dismiss tests the formal sufficiency of a complaint. *Town of Alma v. AZCO Constr., Inc.,* 10 P.3d 1256, 1259 (Colo. 2000).  It is looked upon with disfavor, and a complaint should not be dismissed unless it appears beyond a doubt that a claimant can prove no set of facts in support of his or her claim which would entitle him or her to relief.  *Pub. Serv. Co. of Colo. v. Van Wyk,* 27 P.3d 377, 385-86 (Colo. 2001).  Motions to dismiss should only be granted when the plaintiff's allegations cannot support a claim as a matter of law.  *Wagner v. Grange Ins. Ass'n,* 166 P.3d 304, 307 (Colo. App. 2007).

## III.     Tort Claims

¶ 17     The Millers first contend that the district court erred in determining that the economic loss rule barred their claims for intentional infliction of emotional distress, fraud, and negligence. We disagree.

## A.    Applicable Law

¶ 18     Under the economic loss rule, "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Town of Alma,* 10 P.3d at 1264.

¶ 19     "Contract obligations arise from promises the parties have made to each other, while tort obligations generally arise from duties imposed by law to protect citizens from risk of physical harm or damage to their personal property." *A.C. Excavating v. Yacht Club II Homeowners Ass'n,* 114 P.3d 862, 865-66 (Colo. 2005).

¶ 20     The existence and scope of any duty in tort are questions of law to be determined by the court. *Id.* at 866.  The source of a tort duty may originate from a judicial decision or a legislative enactment. *United Blood Servs. v. Quintana,* 827 P.2d 509, 518 (Colo. 1992).

¶ 21     A special relationship automatically triggers an independent duty of care that supports a tort action even when the parties have entered into a contractual relationship. *A Good Time Rental, LLC v. First Am. Title Agency, Inc.,* 259 P.3d 534, 540 (Colo. App. 2011). The few special relationships recognized in Colorado share the same

characteristic: each implicates a risk of damages to interests that contract law is not well suited to protect. *Id.*

### B.    Analysis

¶ 22    We conclude that the district court properly dismissed the Millers' tort claims because a consent judgment in a federal case challenging dual tracking, discussed below, did not create a private cause of action for third parties, and, therefore, the Millers did not have standing to bring their tort claims. Further, we conclude that no special relationship existed between the parties to establish an independent duty.

### 1.    Private Cause of Action

¶ 23    In April 2012, BANA, four other mortgage servicers, the United States, forty-nine states, and the District of Columbia reached a National Mortgage Settlement that resulted in the consent judgment at issue here. The consent judgment settled complaints brought by the Department of Justice and state attorneys general alleging various foreclosure abuses, including dual tracking. *Chaves v. Bank of Am., N.A.*, No. 3:13-CV-498, 2014 WL 3052491, at *1 (E.D. Tenn. July 3, 2014). The settlement agreement "was intended to provide relief to homeowners whose loans were improperly serviced,

8

resulting in numerous foreclosures that otherwise may have been prevented." *Id.* The consent judgment prohibited most dual tracking, and the Colorado General Assembly subsequently passed a statute that also largely prohibited the practice.[4] § 38-38-103.2, C.R.S. 2015.

¶ 24    The Millers argue that the consent judgment created an independent duty because the Banks agreed to comply with certain servicing standards, including no longer engaging in dual tracking.[5] The Millers also contend that the Banks signed the consent judgment prior to initiating their Rule 120 action and that the consent judgment did not require the Millers to release or waive any right or legal claim as a condition of receiving payments pursuant to it.[6] However, we need not address these arguments because we conclude that the Millers lack standing to sue to enforce provisions

---

[4] Under both the consent judgment and Colorado statute, dual tracking is allowed in certain circumstances. Those circumstances are not at issue here.

[5] The Millers do not allege whether all the Banks were parties to the consent judgment. The Banks allege it was BANA alone.

[6] The Millers state in their opening brief that they received a nominal settlement amount from the consent judgment.

of the consent judgment and that the consent judgment did not create a cause of action for third parties.

¶ 25 In general, federal law presumes that third parties do not have standing to enforce federal consent judgments. *Duque v. Wells Fargo, N.A.*, 462 S.W.3d 542, 546 (Tex. App. 2015). A well-settled line of United States Supreme Court authority establishes that "a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750 (1975); *see also Parrish Chiropractic Ctrs., P.C. v. Progressive Cas. Ins. Co.*, 874 P.2d 1049, 1056 (Colo. 1994) (Colorado law to the same effect).

¶ 26 Several federal circuit courts have interpreted this prohibition on suits by non-parties to a consent decree as meaning that incidental third-party beneficiaries may not enforce a consent decree. *Beckett v. Air Line Pilots Ass'n*, 995 F.2d 280, 288 (D.C. Cir. 1993); *Hook v. Ariz. Dep't of Corr.*, 972 F.2d 1012, 1015 (9th Cir. 1992); *Berger v. Heckler*, 771 F.2d 1556, 1565 (2d Cir. 1985). State courts generally may not decline to recognize federal law. *Howlett v. Rose*, 496 U.S. 356, 371 (1990). Moreover, principles of comity

counsel that state courts should not apply a federal consent judgment in a way that would be prohibited in federal courts. *Duque*, 462 S.W.3d at 546.

¶ 27    Here, while the Millers benefited from the consent judgment when they received settlement funds, they were not parties to it. Therefore, the Millers did not have standing to enforce the consent judgment.

¶ 28    Our conclusion is supported by the decisions of numerous federal and state courts that have unanimously rejected homeowner claims against their lenders premised on the consent judgment, holding that homeowners lack standing to enforce it. *See Dale v. Selene Fin. LP*, No. 3:15CV1762, 2016 WL 1170772, at *13 (N.D. Ohio Mar. 25, 2016); *Purnell v. CitiMortgage, Inc.*, No. 14-11107, 2015 WL 4199243, at *12-14 (E.D. Mich. July 13, 2015); *Flores v. EMC Mortg. Co.*, 997 F. Supp. 2d 1088, 1105-06 (E.D. Cal. 2014); *Adams v. Bank of N.Y. Mellon*, No. 13-CV-509-JD, 2014 WL 3850326, at *1 (D.N.H. Aug. 5, 2014); *Chaves*, 2014 WL 3052491, at *2-4; *Weber v. Wells Fargo Bank, N.A.*, No. 3-13-CV-158, 2014 WL 198661, at *4 (N.D. W. Va. Jan. 15, 2014); *Ghaffari v. Wells Fargo Bank, N.A.*, 6 F. Supp. 3d 24, 29-30 (D.D.C. 2013); *Rehbein v.*

11

*CitiMortgage, Inc.*, 937 F. Supp. 2d 753, 761-62 (E.D. Va. 2013); *Ripa v. Fed. Nat'l Mortg. Ass'n*, No. CV-13-01612-PHX-DGC, 2013 WL 5705426, at *5 (D. Ariz. Oct. 21, 2013); *Duarte v. Wells Fargo Bank, N.A.*, No. 3:13-CV-00371-RCJ, 2013 WL 5236565, at *2 (D. Nev. Sept. 16, 2013); *Winders v. CitiMortgage, Inc.*, No. 3:13-CV-56 CDL, 2013 WL 4039399, at *2 (M.D. Ga. Aug. 7, 2013); *see also Bank of Am., N.A. v. Moody*, 352 P.3d 734, 736 (Okla. Civ. App. 2014); *BAC Home Loans Servicing, LP v. Trancynger*, 847 N.W.2d 137, 141-42 (S.D. 2014); *Duque*, 462 S.W.3d at 546-49 & n.1.

¶ 29 At oral argument, the Millers conceded that the above-cited cases were correctly decided. They nevertheless argue, in their briefs, that these cases are not binding precedent. However, they have cited no contrary authority, and we are persuaded by the unanimous holdings of courts in thirteen states and the District of Columbia.

¶ 30 The Millers also argue, relying only on *Ripa*, that the cases cited are distinguishable. While the Millers correctly note that the *Ripa* court considered actions that had occurred prior to entry of the consent judgment, the *Ripa* court did not rely on that fact when it held that the plaintiff was not a party to the consent judgment

and accordingly could not enforce it. Further, most of the cases addressing this issue have involved conduct occurring after entry of the consent judgment. Therefore, we find no basis on which to distinguish the cases on their facts.

¶ 31 The Millers argue that they did not seek to enforce the terms of the consent judgment, but rather the consent judgment established an independent legal duty forming a basis for their tort claims. We disagree. We see no distinction between the right of incidental third-party beneficiaries — like the Millers — to enforce the provisions of the consent judgment and the consent judgment creating an independent legal duty that would provide the basis for alleging tort claims against the Banks.

¶ 32 In any event, while judicial decisions can create independent duties, the consent judgment was not a judicial decision that could create an independent duty. *See Ross v. Old Republic Ins. Co.*, 134 P.3d 505, 511 (Colo. App. 2006) ("A consent judgment is not a judicial determination of any litigated right, and it is not the judgment of the court, except in the sense that the court allows it to go upon the record and have the force and effect of a judgment."), *aff'd in part, rev'd in part,* 180 P.3d 427 (Colo. 2008).

13

## 2. Special Relationship

¶ 33 In the alternative, the Millers contend that they had a special relationship with the Banks which automatically triggered an independent duty of care supporting a tort action. *A Good Time Rental, LLC*, 259 P.3d at 540. Therefore, they contend that the Banks were required to exercise reasonable care and skill not to engage in dual tracking starting in May 2012. We disagree.

¶ 34 As noted above, very few special relationships are recognized in Colorado tort law, and the lender-borrower relationship is not one of them. *See Town of Alma*, 10 P.3d at 1263; *see also Premier Farm Credit, PCA v. W-Cattle, LLC*, 155 P.3d 504, 523 (Colo. App. 2006) ("In the absence of special circumstances, the relationship between a lending institution and its customer is merely one of creditor and debtor."); *Franks v. Colo. Nat'l Bank-Arapahoe*, 855 P.2d 455, 458 (Colo. App. 1993) ("A relationship of debtor and creditor, standing alone, is insufficient to constitute a special relationship.").

¶ 35 Moreover, courts across the country have held that the consent judgment did not create a special relationship between lenders and borrowers. *See Weber*, 2014 WL 198661, at *3-4

(holding that there ordinarily is no special relationship between lenders and borrowers and the consent judgment did not create such a relationship because the plaintiff lacked standing to enforce it); *Jurewitz v. Bank of Am., N.A.*, 938 F. Supp. 2d 994, 999 (S.D. Cal. 2013) (concluding that the consent judgment did not establish a lender's duty of care to a homeowner); *Ripa*, 2013 WL 5705426, at *3 (same); *Sanguinetti v. CitiMortgage, Inc.*, No. 12-5424 SC, 2013 WL 4838765, at *5-6 (N.D. Cal. Sept. 11, 2013) (same).

¶ 36    Therefore, we conclude the district court did not err in dismissing the Millers' tort claims.

## IV.    Contract Claim

¶ 37    The Millers next contend that the district court erred in dismissing their contract claim for breach of the implied duty of good faith and fair dealing. We disagree.

### A.    Applicable Law

¶ 38    A duty of good faith and fair dealing is implied in every contract. *New Design Constr., Inc. v. Hamon Contractors, Inc.*, 215 P.3d 1172, 1181 (Colo. App. 2008).

¶ 39    A plaintiff may rely on the duty of good faith and fair dealing "when the manner of performance under a specific contract term

allows for discretion on the part of either party." *Id.* (citation omitted). "Discretion in performance occurs 'when the parties, at formation [of the contract], defer a decision regarding performance terms of the contract' leaving one party with the power to set or control the terms of performance after formation." *McDonald v. Zions First Nat'l Bank, N.A.*, 2015 COA 29, ¶ 67, 348 P.3d 957, 967 (quoting *City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006)).

¶ 40    "Good faith performance of a contract involves 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" *Id.* at ¶ 68, 348 P.3d at 967 (quoting *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995)). "Each party to a contract has a justified expectation that the other will act in a reasonable manner in its performance." *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1363 (Colo. App. 1994). "When one party uses discretion conferred by the contract to act dishonestly or to act outside of accepted commercial practices to deprive the other party of the benefit of the contract, the contract is breached." *Id.*

¶ 41    However, the implied duty of good faith and fair dealing cannot contradict terms or conditions for which a party has bargained, nor

can it inject substantive terms into the parties' contract. *ADT Security Servs., Inc. v. Premier Home Protection, Inc.*, 181 P.3d 288, 293 (Colo. App. 2007); *see also Amoco Oil Co.*, 908 P.2d at 507 n.6 (Vollack, C.J., concurring in part and dissenting in part) ("Rather, it requires only that the parties perform in good faith the obligations imposed by their agreement.").

## B.  Analysis

¶ 42    We conclude that the Millers did not state a claim for breach of the implied duty of good faith and fair dealing because they had no reasonable expectation that their loan would be modified or that the Banks would refrain from dual tracking.

¶ 43    Neither of the reasonable expectations the Millers cite has any basis in the parties' contractual agreement.  First, the Millers had no reasonable expectation under their original note and deed of trust that the Banks would modify the loan.  The original note and deed of trust gave BANA the right to foreclose in the event of default and did not require BANA to consider or agree to a modification.

¶ 44    The Millers argue that the note and the deed of trust allow for discretionary action by the Banks.  They cite this language from the original note for support: "If I am in default, the Note Holder *may*

17

send to me a written notice . . . the Note Holder *may* require me to pay in immediately the full amount of [principal] . . . .") (emphasis added in the opening brief).  The Millers also cite the following language from the deed of trust: "*If* Lender invokes the power of sale . . . ."  (Emphasis added in the opening brief.)  However, these contract provisions do not support the Millers' argument.  Rather, they support our conclusion that the original loan and deed of trust gave BANA the right to foreclose in the event of default.

¶ 45    Second, the Millers had no reasonable expectation that the Banks would refrain from dual tracking and cease all foreclosure efforts while the parties were negotiating a loan modification.  The Millers suggest that they had such an expectation because of mortgage lenders' "discretionary power" to commence foreclosure proceedings at the same time they negotiate loan modifications; because the parties were engaged in lengthy negotiations over modification; and because of the consent judgment.[7]

---

[7] The Millers state that the reasons the loan negotiations took so long are disputed.  However, in the motion to dismiss context, this argument is inapposite because we construe all factual allegations in the light most favorable to the Millers.  *Fry v. Lee*, 2013 COA 100, ¶ 17, ___ P.3d ___, ___.

¶ 46    None of these arguments supports the Millers' claim.  The Millers' good faith and fair dealing claim is not based on any terms of performance that were left to the Banks' discretion under the loan documents, as discussed above.  The loan and the deed of trust specified many terms, including how the interest rate would be calculated, when loan payments would become due, and the amount of monthly payments.  However, those documents did not indicate that whether the Banks would enter into loan modification negotiations was discretionary because they did not mention modification procedures at all.  If anything, it appears that the Millers are trying to inject new terms into the loan documents — something they plainly cannot do.  *See McDonald*, ¶ 70, 348 P.3d at 967.  The loan and the deed of trust both specifically gave BANA the right to foreclose in the event of default and did not require BANA to consider or agree to a modification.

¶ 47    The length of the loan modification negotiations is irrelevant now because the parties reached a loan modification agreement.  Further, the length of the loan modification negotiations does not compel the conclusion that the Millers reasonably expected that the Banks would refrain from dual tracking.  The Millers had no

assurance that protracted negotiations would result in a loan modification.

¶ 48 Last, the Millers were not parties to the consent judgment, so, as discussed above, they do not have enforcement rights under that agreement. *See Rehbein*, 937 F. Supp. 2d at 763 n.13 (holding the consent judgment did not support homeowner's good faith and fair dealing claim complaining about dual tracking).

¶ 49 Other courts have rejected other homeowners' similar good faith and fair dealing claims premised on dual tracking. *See id.* at 763-64; *see also Castaneda v. Wells Fargo Home Mortg.*, No. 2:15-CV-08870-ODW-KS, 2016 WL 777862, at *6 (C.D. Cal. Feb. 26, 2016); *Frangos v. Bank of Am., N.A.*, No. 13-CV-472-PB, 2014 WL 3699490, at *4 (D.N.H. July 24, 2014) (rejecting similar good faith and fair dealing claim based on dual tracking); *McFarland v. JP Morgan Chase Bank*, No. EDCV 13-01838-JGB, 2014 WL 1705968, at *9 (C.D. Cal. Apr. 28, 2014) (same); *Ripa*, 2013 WL 5705426, at *5 (same); *Lindberg v. Wells Fargo Bank, N.A.*, No. CV C 13-0808 PJH, 2013 WL 3457078, at *4 (N.D. Cal. July 9, 2013) (same).

¶ 50 For the same reasons, we conclude the district court did not err in dismissing the Millers' contract claim.

## V. Conclusion

The judgment is affirmed.

JUDGE DAILEY and JUDGE FREYRE concur.